**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**TIFFANY CASILLAS THOMPSON**                                                              **PLAINTIFF**

v.                                       **CASE NO. 3:07-CV-00010 GTE**

**DR. RANDALL GUNTHARP**                                                                     **DEFENDANT**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

At the time of the events giving rise to this action the Plaintiff Tiffany Casillas (now Thompson) was a student a Black River Technical College, a State institution of higher learning, located in Pocohantas, Arkansas. The Defendant Dr. Randall Guntharp was a part-time adjunct professor teaching anatomy and physiology at the college. He was also a licensed medical doctor who was board certified in family practice. He was 49 years of age and plaintiff, his student, was one week shy of her 21st birthday.

On March 20, 2005, while plaintiff was attending Defendant's Anatomy Lab between the hours of 6:00 and 7:00 p.m., a video on colorectal cancer was shown to the twelve or thirteen students in the class. During the video the Plaintiff sat next to Dr. Guntharp. She asked him if breast cancer is hereditary. He responded that there was a strong family hereditary component and asked her if she had any family members who had breast cancer. She answered, yes, noting that her grandmother (or great grandmother) had had breast cancer. She then asked when would be the appropriate age at which to be checked. When she told him her age, Dr. Guntharp told her that she should have already been tested. He then asked her if she knew how to do a self-exam.

According to Dr. Guntharp, this conversation took place while he walked over to rewind the video tape. Dr. Guntharp stated that the Plaintiff said that she did not know how to do a breast examination and that she had never had one. He then inquired if she had had a pap smear and advised her that she should have a breast examination when she has a pap test.

There was a standup mannequin model in the lab room which had a breast addition. According to Dr. Guntharp, he pointed out to the Plaintiff that the model did not show all of the areas of breast tissue that one needed to check. The model did not show the "tail" on the breast tissue which goes around under the armpit. Dr. Guntharp then asked the Plaintiff to raise one arm. She complied. He then took her other hand and placed it over her clothing; under the armpit area of the left arm while instructing her how to conduct a self-examination and what to look for. According to Dr. Guntharp, the Plaintiff then stated that she did not know what to feel for at which point he quickly raised her shirt and raised up her bra and took her hand to follow his hand as he felt her breast. He states he used three fingers in the manner in which doctors always conduct such exams going around in smaller and smaller circles and then squeezing the nipple to see if there was any secretion. He estimates that the whole episode from start to finish may have lasted two minutes.

The Plaintiff Casillas' statement of the facts is different in some important respects. She acknowledges that she asked Dr. Guntharp if breast cancer was hereditary and that he then asked if anyone in her family had breast cancer. He then asked her if she knew how to conduct a breast self-examination. She stated, "No, I will ask my doctor." She acknowledges that he asked her to raise her arm and that she did. She states she did not realize what was happening when he suddenly put his hand under her shirt, raised her bra and exposed her breast. She acknowledged

that he used a circular motion when "examining" her breast and that he squeezed the nipple to see if there was any secretion. Before he exposed her breast Plaintiff had no idea of his intentions and she was shocked and scared when he did so. She knew that he was a medical doctor but stated firmly that she did not consent to such an examination and was not aware that he was going to expose her breast before he quickly raised her shirt and bra, and the Court so finds.

There is no evidence that the Defendant made any sexual statements or innuendoes during this episode, and Plaintiff candidly acknowledged that she does not know what his intentions were or if he was seeking sexual gratification. Plaintiff does claim that while Defendant started by touching or examining her breast with two or three fingers he also "fondled" her with his full hand, palm open. Defendant denies he fondled Plaintiff and insists he demonstrated how to conduct a breast self-exam just as any doctor would do with a patient in his/her office.[1] It is clear to the Court that Plaintiff, at the beginning, was sincerely seeking information from the Defendant and that she was a willing participant until the Defendant suddenly, without forewarning and without Plaintiff's permission, exposed her breasts. Until then the Defendant had only gone to the point of noting, and demonstrating, that a proper breast examination must include the "tail" or axilla tissue going from the armpit area back to the breast proper. Plaintiff acknowledged that she was not uncomfortable until she was "exposed."

---

[1] No other doctor or medical expert testified as to the proper manner and procedures to be followed when a doctor is explaining the techniques of breast self-examination. Mr. Jack McCord, the Vice President of the college, to whom Plaintiff reported the incident the following Monday, testified that he did not recall whether Plaintiff reported that Defendant fondled her, but recalled that she clearly felt Defendant's conduct was inappropriate. According to Mr. McCord, Plaintiff cried and was visibly upset when she explained to him what had happened to her.

While there is no evidence from which an inference of malicious intent on Defendant's part can be drawn, Defendant's conduct was not only inappropriate, it was entirely unjustifiable.

The relationship between the Defendant and the Plaintiff was one of teacher-student, not patient-doctor. Defendant provided Plaintiff with no warning that he was going to, or needed to, expose or touch her breast, and Plaintiff clearly gave no consent to such an intrusion into her private space.

The question remains: has Plaintiff proved by a preponderance of the evidence the necessary elements of either her federal or her state cause of action?[2]

The Court will here repeat a portion of its analysis of the law dealing with each of these causes of action. First, to prevail on her § 1983 Substantive Due Process Claim, the Plaintiff must prove: "(1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *Hart v. City of Little Rock*, 432 F.3d 801, 804-05 (8th Cir. 2005) (citations omitted). "[T]he Fourteenth Amendment to the Constitution protects substantive aspects of an individual's liberty from impermissible government restrictions." *Hawkins v. Holloway*, 316 F.3d 777, 780 (8th Cir. 2003) (citations omitted). "Substantive due process offers only limited protections and only guards against the exercise of arbitrary and oppressive government power." *Id*. (citing *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

---

[2] Had Plaintiff sued Defendant for civil battery she would have, on this evidence, most likely been entitled to a verdict on the liability issue since Dr. Guntharp clearly intended to make a physical contact with Plaintiff which he knew, or should have known, would be offensive. But that cause of action has a one-year statute of limitations. The "battery" occurred on Thursday, March 10, 2005, but the Complaint was not filed until January 21, 2007. This may explain Plaintiff's reliance on other legal theories.

4

> "[T]he constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability," *Lewis,* 523 U.S. at 848, 118 S.Ct. 1708, and "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Id.* at 849, 118 S.Ct. 1708. Instead, "[a]ctionable substantive due process claims involve a level of ... abuse of power so brutal and offensive that [they do] not comport with traditional ideas of fair play and decency." *Avalos,* 382 F.3d at 800 (quoting *S.S.,* 225 F.3d at 964) (internal quotations omitted); *see also Moran v. Clarke,* 296 F.3d 638, 647 (8th Cir.2002) (Substantive due process violations involve conduct "so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.") (quoting *In re Scott County Master Docket,* 672 F.Supp. 1152, 1166 (D.Minn.1987)). "Proof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold." *Terrell v. Larson,* 396 F.3d 975, 978 (8th Cir.2005) (citing *Lewis,* 523 U.S. at 848-49, 118 S.Ct. 1708) (holding the deliberate indifference standard is applied when actual deliberation is practical)).

*Hart v. City of Little Rock*, 432 F.3d 801, 806 (8th Cir. 2005).

"In the context of allegations that a state official has abused his executive power, the test we employ to ascertain a valid substantive due process violation is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Hawkins*, 316 F.3d at 780 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "[W]hether assaultive conduct 'shocks the conscience' to a degree sufficient to be cognizable as a constitutional claim depends upon both the nature of the injury or intrusion and the degree to which the intrusion is 'unjustifiable by any government interest.'" *Busch v. City of Anthon, Iowa*, 173 F. Supp.2d 876, 889 (N.D. Iowa 2001). "The Supreme Court has been reluctant to expand the protections afforded by substantive due process 'because guideposts for responsible decision making in this unchartered area are scarce and open-ended,' and it has only done so with the 'exercise [of] the

utmost care.'"  *Hawkins*, 316 F.3d at 780-81 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).

"The guarantee of due process draws a line between the power of the government, on the one hand, and the security of the individual, on the other."  *Id*. at 781 (citing *Burton v. Livingston*, 791 F.2d 97, 99-100 (8th Cir.1986)).  "This line is not a fixed one like a property boundary."  *Id*.  "Its location must be surveyed anew by the court in each case through an examination of the benchmarks disclosed by the circumstances surrounding the case."  *Id*.

"A sexual assault can be a constitutional violation under section 1983."  *Haberthur v. City of Raymore*, 119 F.3d 720, 723 (8th Cir. 1997) (citing *Harris v. City of Pagedale,* 821 F.2d 499, 508 (8th Cir. 1987) (city liable under section 1983 when police officer sexually fondled and raped a woman)).  "This type of constitutional injury has been described as a violation of the substantive due process right to bodily integrity or privacy, and the courts of appeal have recognized that the right may be violated by sexual fondling and touching or other egregious sexual contact."  *Id.*[3]

In *Hawkins*, the Eighth Circuit noted that the Supreme Court had not yet had the opportunity to address whether a sexual assault committed by a state actor may give rise to an

---

[3]Citing *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 727 (6th Cir. 1996) (teacher's fondling a student's breast may violate the substantive due process right to bodily integrity); *McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1197 (4th Cir.), *cert. denied,* 519 U.S. 819, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996) (substantive due process right against unreasonable bodily intrusions violated when employee was forced to his knees, a finger was inserted in his mouth and a broomstick placed next to his clothed buttocks, and he was sexually fondled); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1415-16 (9th Cir.1992) (parole officer not entitled to qualified immunity for depriving woman of clearly established due process right to bodily privacy by entering a bathroom stall and watching her urinate).

actionable substantive due process violation under § 1983, but reviewed the cases in which it had considered the issue, stating:

> In *Haberthur*, we reversed the district court's dismissal of a plaintiff's substantive due process claim arising out of a police officer's sexually-assaultive conduct. We recognized that an actionable claim under § 1983 for a substantive due process violation may accrue where a public official engages in "sexual fondling and touching or other egregious sexual contact" under color of state law and concluded the plaintiff alleged facts demonstrating such conduct. *Haberthur*, 119 F.3d at 723. In particular, the plaintiff alleged that the police officer showed up at her workplace, placed his hands under her shirt and fondled her breast, and caressed her body while making sexually suggestive comments to her. *Id*. at 724.  We characterized the alleged conduct as "intrusive, demeaning, and violative of [the plaintiff's] personal integrity," and recognized that the officer had threatened adverse police action in making his unwanted advances. *Id*.  A little over a year later, in *Rogers*, we upheld a district court's finding following a bench trial that a police officer had sexually assaulted a woman in violation of her substantive due process rights. 152 F.3d at 797.  The facts established that the officer pulled the woman over for a traffic violation and later followed her home under the guise of obtaining her missing proof of automobile insurance.  At her home, the officer ordered her to disrobe, pushed her onto her bed, and had sexual intercourse with her.  We concluded that the facts supported a finding that the intercourse was nonconsensual and that the officer accomplished the rape through the exercise of coercive power that he possessed as a law enforcement officer.  152 F.3d at 796-97.  Recognizing that the officer's conduct was undertaken with no legitimate governmental objective, we held that a police officer's commission of a rape fell at the extreme end of the " 'arbitrary exercise of the powers of government' " that substantive due process protections were intended to guard against.  *Id*. at 797 (quoting *Lewis*, 523 U.S. at 845, 118 S.Ct. 1708).

316 F.3d at 784.

In *Hawkins*, the Eighth Circuit held that while some of the allegations of "sexual assault" were distinguishable from those in *Rogers* and *Haberthur*, the allegations by a female officer that the sheriff repeatedly and intentionally touched her breasts constituted a violation of her bodily integrity sufficient to support a substantive due process claim. *Id*. at 784-85. More specifically, she alleged that from October 1996 until November 1999, "the sheriff inappropriately touched

7

her and made vulgar comments to her during her employment," and the sheriff once came up from behind her and placed his hands around her and grabbed her breasts." *Id.* at 785. Additionally, "[o]n several occasions, the sheriff stood next to her and pulled her close to him[,] [and] [o]ften times when the sheriff did so, he laid his hand on [the female officer's] breast." *Id.* "The sheriff often picked up [her] beverage, placed it near his crotch, and asked [her] if she wanted him to fill it up." *Id.* "[She] was also present when the sheriff pulled his weapon on others, and she feared for her safety during the incidents." *Id. But see id.* ("Not every inappropriate or unwanted touching by a public official, even if accompanied by vulgar comments of a sexual nature, can amount to the 'brutal and inhumane abuse of official power' necessary to demonstrate a violation of an individual's bodily integrity sufficient to support a constitutional violation.").[4]

The Court now turns to the law controlling Plaintiff's state outrage claim: "To establish a claim for the tort of outrage, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was

---

[4]Citing *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998) (concluding that brief touches to a person's buttocks do not support a finding of a sexual assault amounting to cruel and unusual punishment); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996) (holding that a teacher's act of rubbing a student's stomach while he made suggestive remarks to her did not violate the student's right to bodily integrity and stating that it is inconceivable that a "single slap" could shock the conscience); *Reeve v. Oliver*, 41 F.3d 381, 382-83 (8th Cir. 1994) (refusing to find a substantive due process violation when a state actor touched and rubbed a woman's back while staring at her chest); *Petrone v. Cleveland State Univ.*, 993 F. Supp. 1119, 1126 (N.D. Ohio 1998) (holding that allegations of a supervisor's sexual advances, including one where the supervisor slid his hand along a woman's leg toward her pelvic area, did not state a substantive due process claim); *Jones v. Clinton*, 974 F. Supp. 712, 725 (E.D. Ark. 1997) (finding no substantive due process violation where the governor allegedly sought sex from an employee, exposed himself, and asserted that he possessed ongoing authority over the female state employee).

the likely result of his conduct; (2) the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community;' (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it." *Marlar v. Daniel*, 368 Ark. 505, - - S.W.3d - - (2007) (citing *Crawford v. Jones*, 365 Ark. 585, - - S.W.3d - - (2006)). "The type of conduct that meets the standard for outrage must be determined on a case-by-case basis." *Id*. (citing *Crockett v. Essex*, 341 Ark. 558, 19 S.W.3d 585 (2000). "Our court gives a narrow view to the tort of outrage and requires clear-cut proof to establish the elements in outrage cases." *Id.* "Merely describing the conduct as outrageous does not make it so." *Id.*

The Arkansas Supreme Court "has recognized that in some cases the existence of a special relationship between the parties can justify a finding of outrage where "the gist of the claim arose out of the violation of that relationship . . . ." *Allen v. Allison*, 356 Ark. 403, 417, 155 S.W.3d 682, 692 (2004) (quoting *McQuay v. Guntharp,* 331 Ark. 466, 474, 963 S.W.2d 583 (1998)). In *McQuay*, a lawsuit brought against the Defendant in this case, female patients alleged that Dr. Guntharp improperly touched, examined, and fondled their breasts during physical examinations, and that as a result of the trauma, they suffered and continue to suffer from extreme mental anguish. 331 Ark. at 475, 963 S.W.2d at 587. The Arkansas Supreme Court held that the trial court erred in dismissing the plaintiffs' outrage claims for failure to state a claim, emphasizing the relationship in the case. *Id*. The Court stated:

> The nature of the physician-patient relationship and the nature of the allegations presented by [the plaintiffs] create the appropriateness of a suit for tort of outrage. A patient entrusts his or her body and sense of dignity to a physician. The patient

> subjects himself or herself to a loss of this dignity and a loss of privacy by even divulging his or her personal thoughts as to what ails him or her. Looking to the facts alleged in the complaint, it is apparent that these patients were most vulnerable by presenting their bodies to a physician whom they trusted to exercise professionalism in his treatment, only to be taken advantage of by a doctor seeking his own personal gratification.

*Id*. The Court will review the *McQuay v. Guntharp* decisions in much more detail later in the opinion.

The Court notes that there has not been a great deal of consistency in the appellate rulings on either Plaintiff's federal § 1983 claim or her state outrage claim. Under the facts, as found above, the Court is convinced that some courts would conclude Plaintiff has failed to establish the essential elements of either claim; some courts would conclude she has established her case under both; while some would conclude she prevails on one but not the other. Why? Although it is easy to conclude the plaintiff has been wronged here, does she meet the extremely stated requirements of these two particular claims?

With respect to Plaintiff's §1983 substantive due process claim can it be said that the Defendant's conduct here was "so severe . . . so inspired by malice or sadism . . . that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscious"? Obviously not. But we also know that "a sexual assault can be a constitutional violation under § 1983" and that "this type of constitutional injury has been described as a violation of the substantive due process right to bodily integrity or privacy and the courts of appeal have recognized that the right may be violated by sexual fondling and touching . . . " So, under the facts found here, would not Plaintiff have met that standard? Still most of the sexual assault/fondling cases cited have much more egregious facts, some, indeed, involving rape. Then, we find the *Hawkins* case, cited

above, involving the claim that a sheriff repeatedly and intentionally touched a female officer's breasts, which was held to constitute a violation of her bodily integrity sufficient to support a substantive due process claim.  But such repeated conduct was accompanied by vulgar comments and, again, the facts appear to have been more egregious than we have here.  And then we have the cases cited in footnote 4 above in which the Plaintiffs failed to sustain their constitutional claims under § 1983.

With respect to Plaintiff's state claim for the tort of outrage, do the facts as found above establish the elements of that offense?  More particularly, can it be said that Defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct?  Can it also be said that Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community? And, can it be said that the emotional distress sustained by Plaintiff was so severe that no reasonable person could be expected to endure it?

We know that the type of conduct that meets the standard of outrage must be determined on a case by case basis.  And, we know that Arkansas courts give a narrow view of the tort of outrage and require clear-cut proof to establish the elements in outrage cases and that merely describing the conduct as outrageous does not make it so.  But, we also know that the Arkansas Supreme Court has recognized that in some cases the existence of a special relationship can justify a finding of outrage where the gist of the claim arose out of a violation of that relationship.

As noted, with respect to her tort of outrage claim, Plaintiff must establish is that "the emotional distress sustained by the Plaintiff was so severe that no reasonable person could be expected to endure it." It is therefore necessary to review Plaintiff's damage evidence.

Plaintiff was a 21 year old college student at the time of this incident. In addition she worked full time at two hospitals, St. Bernard's in Jonesboro, and a hospital in Lawrence County. At the time she was single. However, since this incident she has married. Her mother is a Registered Nurse working with critically ill patients in the Intensive Care Unit at St. Bernard's. Her father works with children at Cedar Blades Baptist Camp. At the time of this incident, Plaintiff lived with her parents. It is the impression of the Court that Plaintiff is quite intelligent. She was more knowledgeable of the medical world than most 21 year olds.

Plaintiff's proof of damage consists for the most part of her own testimony and the testimony of her parents. But, Mr. McCord also testified that she cried and was upset when she first reported the incident to him on Monday, March 14, 2005. Plaintiff offered no medical or other expert opinions in support of her claim for damages. Ordinarily, expert medical testimony is necessary to support damage claims for physical injuries and pain. However, such evidence is not required to establish or sustain a claim for mental anguish or emotional suffering. See *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1065 (8th Cir. 1997).

Plaintiff testified that her first response to Defendant's exposing her breasts was one of fear and shock. She immediately left the classroom and went to her car where she sat and cried. Although Plaintiff lived with her parents, she did not tell them of her experience until after she reported the incident to Mr. Jack McCord on the following Monday. She has not sought

professional help or counseling although she has talked about her feelings with her parents and her minister. She states that since this event she has not slept well, has nightmares, and finds herself nervous and anxious.

Additionally, she does not trust male figures and particularly male doctors, but she also acknowledges that she has gone to female physicians for most of her life. When Plaintiff got pregnant she apparently did go to a male doctor, but she insisted that her mother accompany her when she visited that doctor. Her parents testified that before this incident Plaintiff was "bubbly" and energetic. But, afterwards, she cries and asks how such a thing could have happened to her. They state that she appears depressed and that she "snaps back at them." Plaintiff claims that this incident also caused her to change her educational major which resulted in her losing essentially two years of credit. This claim was not quantified monetarily, nor adequately shown to be a proximate result of Defendant's actions.

When Plaintiff's attorney asked her what she wanted from the Court, she suggested an award of $150,000 "to punish him" (the Defendant) and to compensate her. Her emphasis was clearly on the former objective.

Does this proof establish that Defendant's actions caused Plaintiff to sustain emotional distress that was "so severe that no reasonable person could be expected to endure it"? Ironically, the Arkansas Supreme Court decisions most pertinent and applicable to the issues here arose out of an action brought by six women against Dr. Randall Guntharp, the Defendant in this case. Those decisions are reported at 331 Ark. 466, 963 S.W.2d 583 (1998) and 336 Ark. 534, 986 S.W.2d 850 (1999). Both decisions deal primarily with statute of limitations issues, but their

rationales provide the closest precedents and the clearest guidance that we have found for an understanding of how the Arkansas Supreme Court would analyze Plaintiff's outrage claim. Both majority opinions were written by Justice Corbin. In the first case, decided in 1998, Justices Newbern and Imber dissented. In both instances, the trial court dismissed the Plaintiff's complaint as being barred by the applicable statute of limitations. The two separate appeals reversed the trial judges rulings and returned the case to the trial court.[5]

The opinion in the first appeal (1998) sets forth the facts:

> Dr. Guntharp is a licensed physician with a medical practice in Pocahontas, employed by the Northeast Arkansas Internal Medicine Clinic, d/b/a Pocahontas Family Clinic. It is undisputed that he last saw Appellants in his office on the following dates: Rachel Keech on November 30, 1993; Charman Rowe on February 4, 1994; Sharion Cantrell on March 11, 1994; Randy Thatch on April 4, 1994; Sue Beebe on October 25, 1994; and Cathy McQuay on January 30,1995. On February 28, 1996, Appellants filed a complaint for the tort of outrage, alleging that Dr. Guntharp had "improperly touched, examined, and otherwise fondled" their breasts during their physical examinations.
>
> * * *
>
> The trial court dismissed the complaint with prejudice, holding that Appellants' claims constituted a battery and was therefore barred by the one-year statute of limitations applicable to such action. At the dismissal hearing, the trial court stated that the facts pleaded in the case did not rise to the level of outrage and added, "it's got to be terrible in order for outrage to occur." On appeal, Appellants do not dispute that the initial complaint was filed more than one year after Dr. Guntharp had any contact with each of them. Instead, they argue that the trial court erred by finding that the complaint described claims for battery instead of outrage.

---

[5] We do not know what further proceedings, if any, occurred in the trial court but we do have the following affidavit statement of Dr. Guntharp:
"All prior civil cases filed against me, as referred to by the Plaintiff, were dismissed by the Circuit Court of Randolph County. Furthermore, the Arkansas Medicaid Board, in response to a formal complaint regarding those cases, found no improper conduct on my part."

* * *

The circumstances of this case are somewhat unusual in that the trial court's dismissal of the case was based solely upon its characterization of the nature of the claim, which resulted in a ruling that the action was barred by the statute of limitations. Accordingly, we must decide whether the trial court erred in characterizing the claim as a battery, as opposed to outrage, and thus ruling that the action was barred by the one-year statute of limitations pertaining to battery.

* * *

Although the complaint states that the action is one for outrage, we must look to the facts alleged, as Arkansas does not recognize "notice pleadings," only "facts pleadings." *Dunlap,* 284 Ark. at 7, 678 S.W.2d at 363. We look to the gist of the action in making such a determination.

* * *

To establish an outrage claim, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Angle v. Alexander,* 328 Ark. 714, 945 S.W.2d 933 (1997). The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Hollomon v. Keadle,* 326 Ark. 168, 931 S.W.2d 413 (1996). This court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases. *Croom v. Younts,* 323 Ark. 95, 913 S.W.2d 283 (1996). Merely describing the conduct as outrageous does not make it so. *Renfro v. Adkins,* 323 Ark. 288, 914 S.W.2d 306 (1996). Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence. *Croom,* 323 Ark. 95, 913 S.W.2d 283.

In *M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980), this court officially recognized the separate tort of outrage, relying in part on the teachings of Professor Prosser:

[Professor Prosser] theorized that there was no necessity that a tort have a name. According to him, the new tort consisted of intentional, outrageous infliction of mental suffering in the extreme form and that it resembled assault. He pointed out that, in spite of the fact that mental anguish had been recognized in early assault cases, the law had been reluctant to accept interest in peace of mind as entitled to independent legal protection. He described the matter dealt with in this new tort as outrageous conduct of a kind especially calculated to cause serious mental and emotional disturbance. Prof. Prosser pointed out that in many cases in which

recovery for mental suffering was permitted as parasitic damage, that element was the only substantial damage actually sustained. Our cases are certainly illustrative of this statement.

*Id.* at 278, 596 S.W.2d at 686 (citing William L. Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* 37 Mich. L.Rev. 874 (1939)). This court stated further:

[W]e can and do now recognize that one who by extreme and outrageous conduct wilfully or wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.

It is of little consequence that different terms are used in describing the element of compensable damages involved as mental suffering, mental anguish, emotional distress, etc. Prof. Prosser sees the term mental anguish comprehensive enough to cover everything from nervous shock to emotional upset, and agrees that the words emotional distress may well be used. In his view they include all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, anger, embarrassment, chagrin, disappointment, worry and nausea. *The emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. It must be reasonable and justified under the circumstances. Liability arises only when the distress is extreme.*

*By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.*

*Id.* at 280, 596 S.W.2d at 687 (citations omitted) (emphasis added). Additionally, in *M.B.M. Co.,* this court cited with approval Professor Prosser's theory that the relationship between the plaintiff and the defendant may give rise to the extreme and outrageous nature of the conduct:

Prof. Prosser states that there are cases in which the extreme and outrageous nature of the conduct arises *not so much from what is done as from the abuse by the defendant of a relationship with the plaintiff which gives him power to damage the plaintiff's interests.*

*McQuay v. Guntharp*, 331 Ark. 466, 468-72, 963 S.W.2d 583, 585-86 (1998)

The Court concludes that Arkansas Supreme Court's emphasis on the special

relationship, as just quoted above, does not relieve the Plaintiff from the burden of proving all of

16

the essential elements of the tort of outrage.  The Arkansas Model Jury Instruction, approved by the Arkansas Supreme Court, which sets forth those elements and the definitions of pertinent terms is AMI 401 which would have been used if this case had been tried to a jury.  It reads:

### **TORT OF OUTRAGE**

> Tiffany Casillas claims damages from Dr. Randall Guntharp, and has the burden of proving each of three essential propositions:
>
> First, that she has sustained damages;
>
> Second, that Dr. Randall Guntharp willfully and wantonly engaged in extreme and outrageous conduct;
>
> And third, that such conduct proximately caused damage to Tiffany Casillas in the nature of emotional distress.
>
> If you find from the evidence in this case that each of these propositions has been proved, then your verdict should be for Tiffany Casillas; but if, on the other hand, you find that any of these propositions has not been proved, then your verdict should be for Dr. Randall Guntharp.
>
> A person acts willfully and wantonly when he/she knows or should know in the light of surrounding circumstances that his/her conduct will naturally and probably result in emotional distress and continues such conduct in reckless disregard of the consequences.
>
> By extreme and outrageous conduct, I mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.
>
> Emotional distress must be reasonable and justified under the circumstances and must be so severe that no reasonable person could be expected to endure it.

And this is the instruction that this Court must follow as the trier of fact here with respect to Plaintiff's state outrage claim

If the case had been tried to a jury using exactly the same evidence, that jury would never have known that the Defendant had previously been accused of very similar conduct by six other women.  And this Court, as the trier of fact here, must also ignore that information with but a slight exception.  When the Defendant contemplated exposing Plaintiff's breasts without her

17

permission, he must have been aware of the extreme seriousness of that decision from his knowledge of the rulings of the Arkansas Supreme Court in the case against him by those six women. And being so aware, if, as he contends, he was attempting to follow standard, approved medical protocols, he would certainly have asked Plaintiff if she wished him to actually demonstrate those procedures on her exposed breasts. The Court also notes that the Plaintiff on two occasions, when Defendant asked her if she knew how to conduct self breast examinations, answered, “No,” but “she would ask her doctor.”

The Court finds that it is more likely true than not true that Defendant, without permission or justification, used the pretext of instruction to obtain the opportunity to see and fondle Plaintiff’s breasts while seeking his own personal gratification. Otherwise, being fully aware of the seriousness of the situation, he would have carefully explained what he was proposing to do and would have insisted on Plaintiff’s uncoerced affirmative consent thereto. The special relationship of teacher-student must also be emphasized. Defendant knew, of course, that Plaintiff depended on him to fairly grade her academic performance. Perhaps he reasoned that by not asking for and obtaining prior consent, he avoided the possibility of clear rejection. Whatever, Defendant’s conduct was extreme and egregious, especially when one considers that he is a medical doctor who by training and experience should be most sensitive to the professional and ethical standards of his profession. The Court also finds that Defendant’s conduct caused Plaintiff to experience some mental anguish and emotional suffering but on the whole, that Plaintiff has gone forward with her life and put this episode behind her, although her justified anger has not abated.

The Court doubts that Plaintiff has produced sufficient evidence to sustain her state tort of outrage claim but makes no final decision thereon because such ruling will not affect the outcome of the case. The Court while recognizing that it is a close question, concludes that Plaintiff has sustained her federal § 1983 substantive due process claim.

In this opinion the Court has reviewed Plaintiff's damage evidence. On the basis of that evidence the Court finds Plaintiff is entitled to Judgment against Defendant in the amount of Thirty-five Thousand ($35,000.00) Dollars. Judgment will be entered accordingly.

Dated this 16th day of November, 2007.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE